**Karen M. DELUCA, Plaintiff,**

v.

**BEAR STEARNS & CO., INC., Mark E. Murphy, Brian C. Jerome, Robert P. Lyons, Bruce Lisman, and Kathy Cavallo, Defendants.**

**No. 00–12100–PBS.**

United States District Court, D. Massachusetts.

Nov. 16, 2001.

Lawrence J. Casey, Nancy S. Shiplepsky, Barbara A. Robb, Sara Rapport, Perkins, Smith & Cohen, Boston, MA, for Karen M. DeLuca.

Barry Y. Weiner, Christopher P. Litterio, Shapiro, Israel & Weiner, P.C., Boston, MA, for Bear Stearns & Co., Inc., Mark E. Murphy, Brian C. Jerome, Robert P. Lyons, Bruce Lisman, Kathy Cavallo.

A. David Mazzone, Boston, MA, pro se.

Robert J. Gregory, Washington, DC, for U.S. Equal Employment Opportunity Com'n.

## MEMORANDUM AND ORDER

SARIS, District Judge.

## I. *INTRODUCTION*

Karen DeLuca brings this action against her employer Bear Stearns & Co., Inc. ("Bear Stearns"), and Bear Stearns employees Mark E. Murphy, Brian C. Jerome, Robert P. Lyons, Bruce Lisman, and Kathy Cavallo (collectively "defendants"), alleging gender discrimination, sexual harassment, and retaliation for testimony she gave in the age discrimination lawsuit of a former co-worker.[1]

The defendants move to dismiss or, in the alternative, compel arbitration and stay the court proceedings pending arbitration, on the grounds that the plaintiff has entered an arbitration agreement that requires DeLuca to submit her claims to an arbitrator. DeLuca contends the agreement to arbitrate is unenforceable.

The U.S. Equal Employment Opportunity Commission ("amicus") has moved for leave to file a brief *amicus curiae* in support of the plaintiff's position. That motion is *ALLOWED.*

After a hearing and the filing of supplemental briefs, the defendants' motion to compel arbitration is *ALLOWED.*

## II. *BACKGROUND*

### A. *The Arbitration Agreements*

Karen DeLuca began working for Bear Stearns in 1985 as a retail sales assistant in its Boston office. On March 6, 1986 DeLuca completed and signed the "Uniform Application for Securities Industry Registration or Transfer" form, a standard securities industry registration form commonly referred to in the industry as a "U–4" form. The U–4 form registered DeLuca as an "associated person" with the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"). By signing the U–4 form, DeLuca agreed to arbitrate any dispute that arose between DeLuca and Bear Stearns that the rules of the NYSE and NASD required to be arbitrated. No specific mention was made of employment disputes in the U–4 document. As of 1996, the NASD's Code of Arbitration Procedure required the arbitration of "[a]ny dispute, claim, or controversy ... in connection with the activities of such associated per-

---

1. Specifically, DeLuca's amended complaint alleges gender discrimination (Counts I & II), retaliation (Counts IV & V), and sexual harassment (Counts VI & VII) in violation of Title VII of the Civil Rights Act of 1964 and Mass. Gen. Laws. ch. 151B against Bear Stearns and the individual defendants, as well as a retaliation claim (Count III) in violation of the ADEA against Bear Stearns. DeLuca also alleges a state law claim for intentional interference with advantageous contractual relationship (Count VIII) against the individual defendants.

son(s), or arising out of the employment or termination of employment of such associated person(s) ...." NASD Manual— Code of Arbitration Procedure, § 10201 (July 1996). Following a rules change by the NASD, effective January 1, 1999, DeLuca and Bear Stearns were no longer required to arbitrate statutory employment discrimination claims unless they agreed to arbitrate such claims by separate agreement.

On June 12, 1997, Bear Stearns presented its Boston office employees with an employee handbook. The handbook contained several documents, including an arbitration agreement, that the employees were required to sign and return. DeLuca received her copy of the employee handbook on June 17, 1997. The arbitration document provided that:

> In consideration of my employment or continued employment with Bear Stearns ... I hereby agree to forego litigation and action in court and to submit to final and binding arbitration any and all claims, controversies of any nature and disputes of any nature whatsoever arising out of or in any way related to hiring, terms and conditions of employment, and cessation of employment, Claims for breach of expressed or implied contract or covenant, tort Claims, Claims for discrimination including, but not limited to Claims brought under Title VII, the federal Age Discrimination in Employment Act (ADEA) ..., Claims under any other applicable federal, state or local laws, rules and regulations, including, by way of example but not limitation, those covering sexual harassment, and all city and state laws and ordinances and decisional law ... excluded from arbitration are any claims that I may have for workers' compensation or unemployment compensation benefits, and claims Bear Stearns may have for injunctive relief or damages for

unfair competition or the unauthorized use or disclosure of trade secrets or confidential information (as to which Bear Stearns may seek and obtain immediate relief in the courts) ....

In addition, DeLuca's version of the arbitration agreement provided:

> I further agree to submit any Claim I may have against Bear Stearns to arbitration within one hundred and eighty (180) calendar days of the Claim arising, and specifically waive any longer statute of limitations which might otherwise control. I further understand and agree that if, for any reason, I am allowed to pursue a Claim in court, (i) the court proceeding must be commenced within the one hundred and eighty (180) calendar days of any Claim arising or within one hundred and eighty (180) calendar days of the termination of my employment, whichever occurs sooner, and (ii) all rights to a jury trial are waived.

DeLuca was given an older version of the arbitration agreement. She contends that the arbitration agreements given to other Bear Stearns employees in the Boston office did not contain the statute of limitation or jury waiver provisions.

On or about June 20, 1997, DeLuca signed and returned the Bear Stearns arbitration agreement (the "Agreement"). DeLuca also signed an Acknowledgment that she was an at-will employee and that her employment was terminable "at any time for any reason." DeLuca, in reference to a clause in the Agreement that read "in consideration of my employment or continued employment with Bear Stearns & Co., Inc. ...," made a notation on the agreement stating, "I do not completely understand this statement but I signed it so that I wouldn't lose my job."

## B. *The Sex Discrimination Claims*

DeLuca alleges that Bear Stearns has afforded men higher positions and greater

compensation, benefits, and employment opportunities than DeLuca, despite their comparable or lesser qualifications and experience. DeLuca also alleges that she has been subjected to a hostile work environment by those (predominately male) employees in the Boston office who make sexually explicit jokes, use misogynistic language, and discuss their personal sexual encounters loudly and publicly on a daily basis. DeLuca states that she suffered additional discriminatory and retaliatory acts after she testified against Bear Stearns in an age-discrimination case of a former co-worker in 1997. DeLuca states that from 1997 to the present the defendants have retaliated against her by failing to allocate new accounts on an equal basis, reassigning her current accounts to others, impeding her ability to travel and to attend certain business-related meetings and events, and subjecting her to a hostile and retaliatory work environment.

On July 11, 2000, DeLuca filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") alleging gender discrimination, sexual harassment, and retaliation. Defendant Kathy Cavallo, Managing Director of Human Resources, conducted an internal investigation into the MCAD charge and concluded that the allegations had no merit. On July 24, 2000, DeLuca, in order to protect her rights in the event arbitration is compelled, submitted her claims to the NASD for arbitration.

### C. *This Case*

DeLuca filed this action on October 11, 2000. In her Amended Complaint, dated December 5, 2000, and again by motion on January 29, 2001, DeLuca requested a stay of the proceedings before the NASD. On December 18, 2000, the defendants filed a Motion to Dismiss or, in the Alternative, Compel Arbitration and Stay Proceedings Pending Arbitration. This Court held a hearing on the defendants' motion on January 29, 2001. At the hearing, the Court stayed this proceeding pending a ruling in the case of *Circuit City Stores, Inc. v. Adams*, 194 F.3d 1070 (9th Cir.1999), *cert. granted*, 529 U.S. 1129, 120 S.Ct. 2004, 146 L.Ed.2d 955 (U.S. May 22, 2000) (NO. 99-1379), and allowed the parties to conduct additional discovery on the issues of consideration for the Agreement and the allegation of duress.

## III. *DISCUSSION*

### A. *Enforcing Agreements to Arbitrate*

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs the enforcement of most written arbitration agreements. The Supreme Court has recently affirmed that the FAA extends to arbitration agreements in the employment contracts of most workers engaged in interstate commerce. *Id.* § 2; *accord Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, ——, 121 S.Ct. 1302, 1311, 149 L.Ed.2d 234 (2001) (holding that Section 1 of the FAA exempts from the FAA only the employment contracts of transportation workers). With the FAA, Congress has declared a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). This liberal policy must underlie the consideration of the enforceability of any arbitration agreement.

When an enforceable arbitration agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending arbitration of the parties, 9 U.S.C. § 3, or compelling the

parties to arbitrate, 9 U.S.C. § 4.[2] In deciding motions to dismiss or stay pursuant to §§ 3 & 4, a federal court may only consider issues relating to the making and performance of the agreement to arbitrate, or the failure to comply with it. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967) (holding that a claim of fraud in the inducement of the entire contract was for arbitrators to decide absent evidence of contrary intent by the contracting parties). Substantive challenges to the contract as a whole must be left to the arbitrator unless there has been a specific challenge to the arbitration clause. *Unionmutual Stock Life Ins. Co. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 529 (1st Cir.1985).

DeLuca brings such a challenge to the validity and enforceability of the arbitration clause itself. When considering such a challenge, this Court must apply state law governing the formation of contracts generally. *See Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (holding that ordinary state-law principles governing the formation of contracts should be applied to issue of whether the parties agreed to arbitrate a certain claim); *Southland Corp. v. Keating*, 465 U.S. 1, 19–20, 104 S.Ct. 852, 863, 79 L.Ed.2d 1 (1984) ("[L]ower courts generally look to State law regarding questions of formation of the arbitration agreement under § 2 ... which is entirely appropriate so long as the state rule does not conflict with the policy of § 2.").

**2.** The defendants have also moved to compel arbitration pursuant to the Massachusetts Arbitration Act ("MAA"), Mass. Gen. Laws ch. 251, §§ 1–19. Because the arbitration agreement falls within the coverage of § 2 of the FAA, the MAA will not be discussed. *See also*

## B. Enforcement of the Arbitration Agreement Must Be "Appropriate" and "Authorized by Law."

The Civil Rights Act of 1991 provides:

"Where appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under [these laws]."

Sec. 118, Pub.L. No. 102–166, 105 Stat. 1071, 1081. Arbitration agreements that are enforceable under the FAA are "authorized by law for purposes of Title VII and ADEA." *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir.1999). "Under the FAA, arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* (quoting 9 U.S.C. § 2).

## C. DeLuca's Claims

DeLuca argues that the Agreement is unenforceable because: (1) the Agreement is not supported by consideration, (2) the Agreement was procured under duress, (3) the Agreement is an unenforceable contract of adhesion, and (4) DeLuca did not understand the Agreement when she signed it. DeLuca claims that she is entitled to a jury trial pursuant to 9 U.S.C. § 4, because a disputed fact issue exists as to whether there is an enforceable agreement to arbitrate. This Court holds that enforcement of the arbitration agreement is authorized by law, and appropriate, and that no question of material fact exists to warrant a jury trial on the issues raised by DeLuca.

*Mugnano–Bornstein v. Crowell*, 42 Mass.App. Ct. 347, 350, 677 N.E.2d 242, 245 n. 7 (1997) (holding that the FAA has the same application to claims asserted under Mass. Gen. Laws ch. 151B as it does to Title VII claims).

## 1. *The Peppercorn*

█ DeLuca claims that this Court may not enforce the Agreement because she did not receive consideration for the Agreement. The defendants state that the requirement of consideration has been satisfied on two grounds: (1) DeLuca signed the Agreement in exchange for her continued employment with Bear Stearns, and (2) DeLuca and Bear Stearns mutually agreed to arbitrate disputes.

### a. *Continued Employment*

Bear Stearns argues that the face of the Agreement sets forth the consideration given to DeLuca in exchange for her agreement to arbitrate, namely, her "continued employment with Bear, Stearns, & Co . . . ." Bear Stearns states that DeLuca was an employee at will, and thus could be terminated at any time, for any reason, including a refusal to sign an arbitration agreement. Under this theory, Bear Stearns' offer to continue her employment if she signed the Agreement sufficed as consideration.

DeLuca argues that there was no consideration because her employment could only be terminated for just cause, and that refusal to sign an arbitration agreement would not constitute just cause for termination. She raises two arguments to support her position that she can only be terminated for cause. She contends that the first U-4 arbitration agreement transformed her into an employee who could only be terminated for cause, and that she had an implied contract with Bear Stearns that it would only terminate her for cause.

DeLuca's employment status at the time she signed the Arbitration Agreement turns out to involve a complicated legal question. Generally speaking, an at-will employee is subject to termination "at any time for any reason or for no reason at all." *Upton v. JWP Businessland,* 425 Mass. 756, 757, 682 N.E.2d 1357, 1358 (1997). Therefore, absent an exception, an at-will employee can be terminated for refusal to sign an arbitration agreement, even when the claims involve charges of sexual discrimination and harassment. Current state case law poses no public policy hurdles to arbitration of statutory claims. *See Mugnano–Bornstein v. Crowell,* 42 Mass.App.Ct. 347, 350 n. 7, 677 N.E.2d 242, 245 n. 7 (1997) (holding that the Federal Arbitration Act has the same application to claims under Mass. Gen. Laws ch. 151B as it does to Title VII claims). Moreover, if plaintiff were an at-will employee, her continuing to work would provide the necessary consideration for the new arbitration agreement contained in the handbook. As the Supreme Judicial Court stated in *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. 686, 691, 664 N.E.2d 843, 847 (1996):

> Surely, if the parties agree in advance of employment that a personnel manual will set forth relative rights and obligations of employer and employee, the manual becomes part of the employment contract. A similar result would be obtained if, during the course of at-will employment, the parties agree, orally or in writing, that thereafter their rights and obligations would include the provisions of an employee manual. An employee remaining with the employer after receiving a manual provides the consideration necessary to support the contract.

*See also Smith v. Graham Refrigeration Prods. Co.,* 333 Mass. 181, 186, 129 N.E.2d 884, 887 (1955) ("The continued employment of the plaintiff by the defendant under the new arrangement, which was not obligatory on the part of the defendant, was sufficient consideration to render the agreement enforceable."). Once a contract is binding, both sides are bound. Consid-

eration for the modification of the employment contract would also be provided by an at-will employee's continuation of employment even when the modification is not in the employee's favor. *Gishen v. Dura Corp.*, 362 Mass. 177, 183, 285 N.E.2d 117, 120 (1972) (holding that there were both consideration and assent for the modification in employee's continuing to work for the company with its knowledge and approval at lower commission rates).

The problem with this simple solution is the pre-existing U–4 arbitration agreement which may affect plaintiff's at-will status. Prior to executing the Agreement, DeLuca and Bear Stearns were subject to the arbitration provisions of the U–4 registration form and the accompanying NASD arbitration rules. These rules (as they existed in 1996 and 1997) required DeLuca and Bear Stearns to arbitrate any dispute, "arising out of the employment or termination of employment...." NASD Manual—Code of Arbitration Provisions, § 10201 ("Required Submission").

As a result, DeLuca states, her "continued employment" could not be consideration for her agreement to arbitrate because at least three circuits have held that an agreement to arbitrate employee termination may vitiate an employee's at-will status. *See PaineWebber, Inc. v. Agron*, 49 F.3d 347, 352 (8th Cir.1995) (declining to vacate arbitrator's ruling that a termination was unjustified even though an employee was at-will under state law); *Truck Drivers, Oil Drivers, Filling Station and Platform Workers' Union Local 705 v. Schneider Tank Lines, Inc.*, 958 F.2d 171, 175 (7th Cir.1992) (holding that in a collective bargaining agreement, the existence of an arbitration provision implies a just-cause standard); *Smith v. Kerrville Bus Co., Inc.*, 709 F.2d 914, 917–18 (5th Cir. 1983) ("Detailed provisions in labor contracts for the processing of grievances from employee terminations may, in some circumstances, justify the implication of a just cause requirement.").

In *PaineWebber*, the Eighth Circuit considered the effect of the NASD's arbitration provisions on the presumption of at-will employment. The court acknowledged the strong at-will presumption in the forum state of Kansas, but stated,

> PaineWebber's relationship with Agron under the oversight of the NASD contemplated the use of the arbitration procedure as a means of settling employment-related disputes. This process necessarily alters the employment relationship from at-will to *something else*— some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship ... If Agron's employment was purely at-will, the arbitration procedure designed to interpret that employment relationship would serve no identifiable purpose. Accordingly, the arbitration panel had the power to determine whether the firing was justified. PaineWebber has not shown that the arbitrators' power was expressly limited to application of the Kansas at-will doctrine by the terms of the employment agreement, promissory note, or any other factor.

*PaineWebber*, 49 F.3d at 352 [citations omitted] [emphasis added]. While Massachusetts, too, follows the "general rule" of at will employment, *see Upton*, 425 Mass. at 757, 682 N.E.2d 1357, it also adheres to the basic tenet of contract interpretation that a contract shall not be construed to have a meaningless clause, *see Lexington Ins. Co. v. All Regions Chemical Labs, Inc.*, 419 Mass. 712, 713, 647 N.E.2d 399, 400 (1995) (interpreting a fire insurance contract).

Neither the First Circuit nor the Massachusetts courts have addressed the legal question whether an arbitration agreement transforms the employment status of a signing employee from at-will to for-cause, or something else. *Cf. O'Brien,* 422 Mass. at 696, 664 N.E.2d at 850 (declining to decide whether personnel manual altered the employment status of an otherwise at-will employee, because the employee had failed to follow the required grievance procedures).

Ironically, by agreeing to arbitrate any employment-related disputes, the employer has left the precise contours of the employment relationship to an arbitrator, and may well have given up the employer friendly at-will standard for "something else." Under the Agreement, an arbitrator would have to determine the parties' intent by examining the interplay of the arbitration provision and the statement in the Bear Stearns "Acknowledgment," signed by DeLuca a few days before she signed the arbitration agreement, that "mine is an employment at-will-relationship." (DeLuca Aff., C.1; *see also id.* at C.2.) The record demonstrates that under the U-4 arbitration agreement, an arbitrator has found that another co-employee could not be terminated except for cause. Courts are not bound by arbitral rulings, nor are the arbitrators themselves obliged to follow the rule of *stare decisis. Smith,* 709 F.2d at 918 n. 2. However, the arbitrary decision highlights the conclusion that the pre-existence of the binding U-4 arbitration agreement renders plaintiff's employment status unclear. Indeed, the problem before the arbitrator will be particularly difficult because, as pointed out earlier, the employee handbook states in at least three places that "the employee relationship" between Bear Stearns and the employee is terminable at the will of either party, terminable with or without cause, and terminable without prior notice. (DeLuca Aff. at B, pp. i, 29, 31, 32.)

To complicate matters further, even if this court declined to apply the case law finding for-cause status based on an arbitration agreement, plaintiff contends that under established Massachusetts precedent, Bear Stearns' comments, practices and "Culture Book" catapult her into the status of an employee who can be fired only for cause. DeLuca states that before she signed the Bear Stearns Agreement, it was her understanding that she could only be terminated for a good reason, such as illegal or unethical behavior, poor job performance, or violating company policies, and then only after receiving a warning and failing to rectify the concern. (DeLuca Aff. ¶ 24.) DeLuca bases these inferences on her observations as a Bear Stearns employee, her training as a Bear Stearns manager, her discussions with Bear Stearns human resources personnel regarding the circumstances and procedures by which Bear Stearns employees could be terminated, and her interpretation of the Bear Stearns Culture Book. (*Id.* ¶ 25) DeLuca argues that this evidence creates a disputed issue of fact that Bear Stearns created an implied contract of employment terminable only for just cause. *See O'Brien,* 422 Mass. at 690–95, 664 N.E.2d 843 (holding that promises made in a personnel manual may be binding on an employer); *Hobson v. McLean Hosp. Corp.,* 402 Mass. 413, 415–16, 522 N.E.2d 975 (1988) (holding that complaint stated a cause of action as to creation of a just-cause requirement from employer's by-laws and practices); *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8, 15, 525 N.E.2d 411, 416 (1988) (finding employment at-will despite written two-stage grievance procedure in personnel manual); *but see Vakil v. Anesthesiology Assoc. of Taunton, Inc.,* 51 Mass.App. Ct. 114, 120, 744 N.E.2d 651, 656 (2001)

(holding that an employer was not bound by an alleged oral modification of a written agreement which transformed an employee at-will into an employee terminable for cause where there was no consideration offered by the employee). Viewing DeLuca's evidence in the most favorable light, an arbitrator might conclude that Bear Stearns U–4 arbitration agreement, its Culture Book and practices, together with statements from management created an implied employment contract in which it *could not* terminate DeLuca except for good cause at the time she was required to sign the new handbook.

However, DeLuca should not be too "U–4"ic about this possibility. Even if she were a for-cause employee, it is possible she could be fired for refusal to sign a modification to her employment agreement that expands and changes the issues subject to arbitration. "Good cause" has been defined as "(1) a reasonable basis for employer dissatisfaction with a[n] ... employee, entertained in good faith, for reasons such as ... failure to conform to usual standards of conduct... (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business." *Goldhor v. Hampshire College*, 25 Mass.App.Ct. 716, 723, 521 N.E.2d 1381, 1385 (1988) (quoting *Klein v. President & Fellows of Harvard College*, 25 Mass.App.Ct. 204, 208, 517 N.E.2d 167 (1987)). Although this issue was not well developed in the briefs, it is hard to see how this particular modification relating to the forum in which disputes are resolved falls under either the business needs or employee performance prongs. On the other hand, the Supreme Court has recently and explicitly detailed the benefits to employers of arbitration provisions in employment contracts. *See Circuit City*, 121 S.Ct. at 1313 (stating that arbitration agreements in employment disputes reduce litigation costs, avoid complicated choice of law issues, and eliminate the need to have bifurcated proceedings because of state law restrictions). An arbitrator could, therefore, plausibly conclude that the need to guard against excessive litigation costs is a legitimate business-related reason for termination of a for-cause employee.

Even if an arbitrator eventually determines that DeLuca was a for-cause employee who could not be fired for refusal to sign an arbitration agreement, Bear Stearns argues it wins anyway because its legal duty to continue DeLuca's employment was unclear. DeLuca's belief that she would be terminated for failure to sign the agreement, as manifest by her notations on the form itself ("Fearing for my job, I signed ... the Arbitration Document." DeLuca Aff. ¶ 26), could itself make valid the Agreement.

> [I]f an employee reasonably believed that the employer was offering to continue the employee's employment on the terms stated in the manual, the employee's continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contact ... The fact that the employer did not intend to make such an offer, and that there was no explicitly bargained-for exchange, does not matter if employees in general would reasonably conclude that the employer was presenting the manual as a statement of the condition under which employment would continue."

*O'Brien*, 422 Mass. at 693, 664 N.E.2d at 848. This argument would not fly if Bear Stearns' duty to continue DeLuca's employment were clear. *See* Restatement (Second) of Contracts § 75 Cmt. c (1979) ("A promise to perform a legal duty is not consideration for a return promise unless performance would be.") However, the only thing clear here is lack of clarity.

The exchange of promises ("I'll arbitrate if you continue my employment") does provide consideration in light of Bear Stearns' uncertain legal duty to continue DeLuca's employment which would hinge on the determination of a yet-to-be selected arbitrator. *See Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority,* 15 Mass.App.Ct. 992, 448 N.E.2d 70 (1983) ("the requirement of consideration is satisfied ... if the duty is doubtful or is the subject of honest dispute."); *See also In re Lloyd, Carr & Co.,* 617 F.2d 882, 890 (1st Cir.1980) (finding no consideration where pre-existing legal duty is "neither doubtful nor subject to honest and reasonable disputes."). The fact that its policy was to defer terminating employees who did not sign does not change the outcome if Bear Stearns had a right to terminate but promised to forbear. *See* Restatement (Second) of Contracts ¶ 79 Cmt. c (1979).

### b. *Other Consideration*

■ Consideration can also be provided by a mutuality of promises to arbitrate. Under Massachusetts law, the requirement of consideration is satisfied if there is either a benefit to the promisor or a detriment to the promisee. *Fall River Housing Joint Tenants Council, Inc. v. Fall River Housing Authority,* 15 Mass.App.Ct. 992, 993, 448 N.E.2d 70, 73 (1983) (citing Restatement (Second) of Contracts § 73, Cmt. b (1979)). The exchange of mutual promises provides adequate consideration for the enforcement of a contract. *See Bernstein v. W.B. Mfg. Co.,* 235 Mass. 425, 427, 126 N.E. 796, 797 (1920) (stating that in a bilateral agreement both of the mutual promises must be binding or neither will be). The law is not concerned with the adequacy of the consideration, as long as it is "valuable." *V. & F.W. Filoon Co. v. Whittaker Corp.* 12 Mass.App.Ct. 932, 933, 425 N.E.2d 399, 400 (1981). However, a promise that binds one to do nothing at all is illusory and cannot be consideration. *Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority,* 357 Mass. 40, 43, 255 N.E.2d 793, 796 (1970).

Defendant urges the Court to find that the arbitration agreement clarified the parties' arbitration obligations, and thus was supported by valid consideration. Plaintiff argues that Bear Stearns had a clear legal duty to arbitrate employment disputes under the U–4 agreement, and therefore provided no additional consideration for the new agreement.

The new arbitration agreement did clarify the parties' obligation to arbitrate statutory employment discrimination claims, such as those listed in the agreement. This obligation was, in fact, in doubt at the time Bear Stearns issued the new Arbitration Agreement in the Employee Handbook. *See, e.g., Prudential Ins. Co. of America v. Lai,* 42 F.3d 1299, 1305 (9th Cir.1994), *cert. denied* 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995) (holding that employees could not be compelled to arbitrate under the U–4 agreement because "they could not have understood that ... they were agreeing to arbitrate sexual discrimination suits."); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 965 F.Supp. 190 (D.Mass.1997) *aff'd* 170 F.3d 1 (1999) ("It is an open question at this point, whether arbitrators are able to vindicate [those] public rights," involved in statutory discrimination claims).

Plaintiff argues that these cases were concerned with ensuring the voluntariness of an employee's waiver, and didn't affect the duty of an employer to arbitrate because a sophisticated employer knows the scope of the NASD rules. While this distinction between enforceability against an employer and an employee is fair, as of 1997 the circuits split on whether the generic U–4 clause in the 1986 form even

covered employee disputes. *Contrast Farrand v. Lutheran Bhd.,* 993 F.2d 1253 (7th Cir.1993) (holding that the NASD provision then in effect did not cover employment disputes), *with Kidd v. Equitable Life Assurance Society,* 32 F.3d 516 (11th Cir.1994) (holding the contrary).

Although plaintiff points to 1996 and 1997 rules which clearly encompass employment disputes, plaintiff (as well as Bear Stearns) could argue that this was an impermissible expansion of the parties' initial agreement to arbitrate in 1986, and therefore the waiver was not knowing. In any event, Bear Stearns correctly points out that both sides were at the mercy of the NASD's decision as to the scope of arbitration required by its rules, and this rendered the obligation to arbitrate employment disputes uncertain. Thus, this exchange of promises to arbitrate statutory employment discrimination claims constitutes sufficient consideration because the pre-existing legal duty to arbitrate such claims was uncertain and subject to change.[3] *See generally Restatement (Second) of Contracts* ¶ 73 (1979).

## 2. *Duress*

▉ DeLuca argues that Bear Stearns' timing of the promulgation of the Agreement to the Boston office demonstrated Bear Stearns' "nefarious" intent to coerce and interfere with cooperation and prospective testimony at former co-worker's arbitration. She claims that this interference somehow overcame her free will and coerced her into signing the Agreement.

For the purposes of this motion, this Court takes the following allegations as true and draws all reasonable inferences therefrom: Sometime in or after April 1996, a recently terminated Bear Stearns employee, Nulsen Smith, asked DeLuca to testify in his age discrimination arbitration against Bear Stearns and some of its employees. (DeLuca Aff. ¶¶ 9–10.) DeLuca, though concerned that Bear Stearns would retaliate, agreed. (*Id.*) DeLuca told her supervisor, defendant Mark Murphy, that she had agreed to testify in Smith's case. (*Id.* ¶ 11.) Shortly thereafter, a Bear Stearns attorney interviewed DeLuca; DeLuca expressed her belief that Smith had been treated unfairly. (*Id.* ¶ 12.) After the interview, DeLuca had a conversation with Personnel Director Jennifer Hazard. As Hazard told DeLuca, the Bear Stearns attorney had stated that meeting with DeLuca was like "pulling teeth." (*Id.* ¶ 14.)

In May 1997, Smith's attorney's office contacted DeLuca to tell her that Smith's case would begin at the end of June. (*Id.* ¶ 16.) On June 17, 1997, DeLuca received the employee handbook from Bear Stearns. (DeLuca Depo. at 82–83.) After receiving the handbook, DeLuca spoke with co-workers outside of Boston and learned to her dismay that the handbook had not been distributed to other Bear Stearns offices. (DeLuca Aff. ¶ 18.) On June 20, 1997, fearing for her job, DeLuca signed the Agreement. (*Id.* ¶ 26.)

DeLuca states that because she was required to sign the arbitration agreement within days of the commencement of Smith's case, and because only Boston office employees were being required to sign the agreement, she felt intimidated, threatened, and coerced. (*Id.* ¶ 19.) DeLuca feared that she was being punished and would continue to be punished for agreeing to testify in Smith's case. (*Id.*) DeLuca also felt that Bear Stearns would retaliate

---

**3.** The fact that the Arbitration Agreement was written in the first person is not material. The Agreement was binding on both sides.

*See O'Neil v. Hilton Head Hospital,* 115 F.3d 272, 274 (4th Cir.1997).

against her if she testified honestly, and that, when testifying, she would have to choose her words carefully or risk losing her job. (*Id.*) DeLuca states she could not afford to be terminated as she had two young children to support and feared she would never get a comparable opportunity at a comparable securities firm. (*Id.* ¶ 27.) After receiving a subpoena for Smith's arbitration hearing, DeLuca testified on August 7, 1997. (*Id.* ¶¶ 29–30.)

Despite DeLuca's understandable concern, Defendants produced evidence that the employee handbook was distributed nationwide to all Bear Stearns offices and had nothing to do with DeLuca's testimony in Smith's case. (Bishop Aff. ¶¶ 9, 11.) They offer a memorandum from Bear Stearns Director of Human Resources, Steve Lacoff, sent to all Senior Managing Directors dated March 14, 1997, stating that the employee handbook was ready for distribution and would be distributed to each employee within the coming weeks. (*Id.* Ex. A.) In addition, an e-mail message dated May 29, 1997, sent to Bear Stearns Human Resources managers nationwide, stated that the employee handbook was ready, explained the procedures for its distribution, and set June 27, 1997 as the deadline for the return of the employee-signed releases (including the Agreement) to the Bear Stearns Personnel Department. (*Id.* Ex. B.) Bear Stearns offers further persuasive evidence that the distribution of employee handbooks was a nationwide process, that handbooks were distributed to all Bear Stearns' domestic offices, and that Bear Stearns intended to give a handbook to every Bear Stearns' employee in the United States (Affidavit of Christopher Litterio, Ex. 4 (Corwin Depo. Tr. Vol I at 27–29, 56–57.)) There is no substantial evidence that the arbitration agreement was intended to intimidate plaintiff or to retaliate against her for testifying on behalf of a co-worker.

To avoid a contract on the basis of duress, a party must show that the conduct by the other party caused her to enter into the contract, "under the influence of such fear as precludes [her] from exercising free will and judgment." *Coveney v. President & Trs. of the Coll. of the Holy Cross,* 388 Mass. 16, 22, 445 N.E.2d 136 (1983); *see also Willett v. Herrick,* 258 Mass. 585, 603, 155 N.E. 589, 596 (1927) ("[T]o set aside an agreement because of duress, the will of the party subjected to it must be overcome, and the means made use of must be such as to overcome the mind of an ordinary person."). DeLuca fails to show that she signed the arbitration agreement as a result of pressure from Bear Stearns that overcame her will. She was given two days to look at the handbook and consult an attorney. The entire Bear Stearns Boston office was asked to sign an arbitration agreement. DeLuca points to no action by a Bear Stearns employee which overcame her will in particular. DeLuca did not enter the Agreement as a result of duress.

### 3. *Contract of Adhesion*

■ The Agreement could well be described as a contract of adhesion, as the parties did not negotiate the provisions of the contract. *See Chase Commercial Corp. v. Owen,* 32 Mass.App.Ct. 248, 253, 588 N.E.2d 705, 708 (1992). Courts refuse to enforce contracts of adhesion that are unconscionable, are unfair in the particular circumstance, or that offend public policy. *Bull HN Information Systems v. Hutson,* 229 F.3d 321, 331 (1st Cir.2000); *Chase Commercial,* 32 Mass.App.Ct. at 253, 588 N.E.2d at 708. DeLuca contends that the Agreement is unenforceable on all three grounds.

■■ Massachusetts courts do not find agreements to arbitrate *per se* unconscio-

nable. *See Chase Commercial,* 32 Mass. App.Ct. at 253, 588 N.E.2d at 708 (finding jury waiver not unconscionable as it was less severe than acceptable agreements to arbitrate). The First Circuit has held that "absent a showing of fraud or oppressive conduct," a pre-dispute arbitration agreement in the employment context, "is not unenforceable on [unconscionability] grounds." *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 170 F.3d 1, 17 (1st Cir.1999) (enforcing the U–4 agreement against an employee). An employee must show "both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive." *Rosenberg,* 170 F.3d at 17 (quoting *Seus v. John Nuveen & Co., Inc.,* 146 F.3d 175, 184 (3rd Cir.1998)). DeLuca fails to demonstrate that the arbitration agreement's provisions were oppressive. While Bear Stearns surely received the lion's share of the contract's benefits, such "inequality in bargaining power 'is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.' " *Id.* (quoting *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 33, 111 S.Ct. 1647, 1655, 114 L.Ed.2d 26 (1991)).

Nor is the Agreement unfair under the particular circumstances of this case. DeLuca points out that she is not an attorney, was not represented by counsel and had a mere two days to consider the arbitration agreement. None of these facts, however, amounts to unfairness sufficient to overcome the "usual rule that even standardized contracts are to be enforced according to their terms." *Chase Commercial,* 32 Mass.App.Ct. at 254, 588 N.E.2d at 709 (citing *Minassian v. Ogden Suffolk Downs, Inc.,* 400 Mass. 490, 492, 509 N.E.2d 1190 (1987)). DeLuca is a sophisticated businesswoman with a college education and, at the time she signed the agreement, twelve years of experience in the securities industry. In 1997 she made $175,000 a year, and in 2000 she made $525,000. She had two days to consider the Agreement, and could have sought counsel which she could easily afford in that time.

Finally, the Agreement does not violate public policy inherent in federal and Massachusetts anti-discrimination law. *See Mugnano–Bornstein v. Crowell,* 42 Mass. App.Ct. at 351, 677 N.E.2d 242 (agreeing with the contention that the reasoning of *Gilmer* is generally applicable to claims brought under Mass. Gen. L. ch. 151B). As discussed below, statutory discrimination claims may appropriately be resolved through arbitration. Consequently, the arbitration agreement, though a contract of adhesion, may be enforced by this Court.

### 4. *Failure to Understand Agreement*

Finally, DeLuca argues that the Agreement is unenforceable because she did not understand the contents of the Agreement. DeLuca wrote on the Agreement that she did not completely understand the clause, "[i]n consideration of my employment or continued employment," and that she signed the Agreement so she would not lose her job. She states that no Bear Stearns representative reviewed the handbook with her and that she was not informed that she had the right to negotiate terms or could consult with an attorney. (DeLuca Aff. ¶¶ 20, 21.) DeLuca also states that at the time she signed the agreement, she was not familiar with the term "at-will employee." (DeLuca Aff. ¶ 23.)

In the absence of fraud, a person who signs a written agreement is bound by its terms whether she reads and understands them or not. *Tiffany v.*

*Sturbridge Camping Club, Inc.,* 32 Mass. App.Ct. 173, 175 n. 5, 587 N.E.2d 238, 240 n. 5 (1992). A "grumbling acceptance," that is, a comment, purported clarification, or expression of dissatisfaction appended to an acceptance, constitutes an acceptance nonetheless. *Massachusetts Housing Finance Agency v. Whitney House Associates,* 37 Mass.App.Ct. 238, 241, 638 N.E.2d 1378, 1380 (1994). DeLuca's notation on the Agreement is such a "grumbling acceptance."

## C. *Enforcement of the Arbitration Agreement Is "Appropriate."* [4]

■ Finally, DeLuca has claimed that enforcement of the Agreement is not "appropriate," under the Civil Rights Act of 1991, Sec. 118, Pub.L. No. 102–166, 105 Stat. 1071, 1081; *see Rosenberg,* 170 F.3d at 19–20 (enforcement of an arbitration agreement "inappropriate" where employer failed to inform employee of the statutory claims that were subject to arbitration, despite its certification to the contrary). DeLuca cites two grounds for finding enforcement inappropriate. First, DeLuca argues, Bear Stearns' conduct in imposing the Agreement demonstrated Bear Stearns' improper attempts to interfere with her testimony in the Smith case. Second, the Agreement's jury trial waiver demonstrates Bear Stearns' "nefarious intent."

As a matter of law, claims arising under Title VII and under the Age Discrimination in Employment Act ("ADEA"), can be appropriately resolved through arbitration. *Rosenberg,* 170 F.3d at 4 (holding "the application of pre-dispute arbitration agreements to federal claims arising under Title VII and the ADEA is not precluded by the Older Workers Benefit Protection Act ('OWBPA') amendments to the ADEA or by Title VII as amended by the 1991 CRA."). To enforce such an arbitration agreement, however, the employee must receive some minimal level of notice that her statutory claims will be subject to arbitration. *Id.* at 21; *see Ramirez–De-Arellano v. American Airlines, Inc.,* 133 F.3d 89, 91 n. 2 (1st Cir.1997) (suggesting that an agreement to waive the right to a judicial forum for civil rights claims in exchange for employment or continued employment must at least be express).

In this case, the Agreement itself listed the statutory employment claims that would be subject to arbitration, including, *inter alia,* claims arising under Title VII, the ADEA, the Americans with Disabilities Act (ADA), and the OWBPA. Thus, the arbitration agreement provided DeLuca with adequate notice that she would have to arbitrate her statutory discrimination claims. *See Rosenberg* at 21 n. 17 (rejecting "a subjective standard which focuses on what the employee actually knew.").

DeLuca fails to state adequate grounds to hold this arbitration agreement unenforceable in these particular circumstances. She merely repaints her reasons that the Agreement would not be authorized by law, citing no reason that the enforcement of the Agreement itself would be inappropriate. As stated above, DeLuca has not adequately linked Bear Stearns' conduct in imposing the Agreement with its alleged attitude toward her participation in the Smith case.[5]

---

4. The EEOC claims that the federal requirement that the enforcement be "appropriate" includes the limitation that the arbitration be supported by valid adequate consideration. While this is a fair point, consideration is also a requirement of the common law and the FAA and is addressed above.

5. Nor does the inclusion of the jury and statute-of-limitations waiver provisions in the version of the arbitration agreement given to

## IV.  ORDER

For the foregoing reasons, the defendants' Motion to Dismiss or, in the Alternative, Compel Arbitration and Stay Proceedings Pending Arbitration (Docket No. 3) is **ALLOWED.**  The Court **ALLOWS** Defendants' motion to compel arbitration and stays these proceedings.

DeLuca show that the severable arbitration agreement itself is inappropriate.  The Court need not determine whether the waiver of jury provision or the six month time bar violates public policy.  Particularly since it was contained in an older version of the handbook which was mandatory nationwide, it is not clear from this record whether Bear Stearns would seek to enforce it.  As the arbitration clause is enforceable, that is a matter for another day.