THE BANK OF UNITED STATES *vs.* THOMSON & KELLY CO.
& others.

Suffolk.   December 11, 1933. — March 26, 1935.

Present: RUGG, C.J., FIELD, DONAHUE, & LUMMUS, JJ.

*Contract,* What constitutes. *Pledge. Damages,* For breach of contract.
*Evidence,* Presumptions and burden of proof. *Practice, Civil,* Recoupment.

There was no binding contract between the payee of a promissory note
and an accommodation indorser, who had deposited stock with the
payee as collateral "to secure" such indorsement, for the sale of the
stock by the payee and the application of the proceeds to the note
where, even if the payee promised that he would make the sale upon
receipt of authority in writing to do so from the indorser, the only
authority delivered to the payee thereafter was a writing purporting
to be signed by the maker of the note, not by the indorser.
A defendant who seeks damages in diminution of the plaintiff's claim by
recoupment has the burden of proving his damages and can recoup
only to the extent of the damages so proved.
The burden, of proving in recoupment damages resulting to an accommodation indorser of a promissory note from breach by the payee of
an alleged contract between those parties whereby stock deposited by
the indorser with the payee as collateral "to secure" such indorsement
was to be sold by the payee and the proceeds applied to the note, was
not sustained where there was evidence of the market value of the
stock at the time when such sale, allegedly, should have been made,
but no evidence of any reduction in its market value thereafter.

BILL IN EQUITY, filed in the Superior Court on February
4, 1932.

The bill and proceedings in the suit are described in the
opinion. The jury issue was tried before *Morton,* J. The
final decree was entered by order of *Donnelly,* J.

*H. A. Bergson,* for the defendants.

*E. O. Proctor,* for the plaintiff.

DONAHUE, J. The question here presented is whether
there was evidence which would warrant the finding by a
jury that the plaintiff, the payee and holder of a note for
$58,500, at some time after the note was delivered made

an agreement with two accommodation indorsers thereof to sell collateral which they had deposited with the plaintiff as security and to apply the proceeds to the note. The holder brought this suit in equity to establish the liability of the maker and the two indorsers and to reach and apply an alleged interest of the indorsers in stock of certain corporations named as defendants. The bill was taken as confessed against those corporations and against the maker, an interest of the indorsers in stock of certain of the defendant corporations was found by a master and an issue was framed for a jury to determine the amount, if any, of the indebtedness of the indorsers to the plaintiff. At the jury trial the amount of the principal and interest on the note which remained unpaid was agreed upon, the signatures on the note were admitted and the plaintiff introduced the note without objection and rested. Each of the indorsers, in signing the note, waived "any notice of default, nonpayment and protest." The indorsers, who had pleaded the right to recoup in damages, offered evidence which is hereinafter recited. The trial judge ruled that no right to recoup damages was shown by such evidence and directed the jury to "answer the issue in favor of the plaintiff" for the amount of the unpaid principal and interest due on the note. The indorsers' exception to this ruling and direction is here presented by a bill of exceptions. Thereafter a final decree was entered for the plaintiff and the indorsers appealed.

The evidence introduced by the indorsers at the jury trial is here summarized. At the time of the indorsement of the note by them the indorsers signed collateral loan agreements and delivered to the payee three hundred fifty shares of Warner Bros. Pictures Inc. stock, which stock was apparently owned and at any rate was controlled by them. An accompanying letter stated that the stock was delivered "to secure our endorsements." The terms of the note required an instalment payment of $7,312.50 to be made every three months. When the third instalment became due in March, 1930, a check for its amount was delivered to the president of the plaintiff bank, whose

name was Marcus, by one Thomson who was the New York representative of the maker, Thomson & Kelly Co. The principal place of business of that firm and of the indorsers apparently was in Boston. Thomson testified that Marcus then asked how the firm of Thomson & Kelly Co. was getting along, stated that the collateral was less than the amount due on the loan and that he thought it was a very good time and would be a good idea to sell the collateral and reduce the loan and requested the witness "to get a letter from Boston authorizing him to sell such security"; that Thomson told Marcus "he would get in touch with Boston, with [the indorsers] . . . and have such a letter produced and delivered to Marcus," and said, "I will immediately report to Boston and suggest to them that they sell and get such a letter from them"; and that Marcus said "he would attend to it immediately upon receipt of such authority." Thomson further testified that he had "communicated with Boston and got a reply from Boston with reference to this matter" and that on March 13 he told Marcus over the telephone that he "had just received a letter from Boston in which they stated that they had forwarded the authority to Marcus, that he had asked witness for, to sell the stock, and Marcus said he had received it and would attend to it."

There was evidence that on March 12 one of the indorsers dictated, signed and mailed at Boston a letter to the plaintiff which said: "In regard to the note which you are carrying for us, will you kindly sell all of the Warner Bros. stock which you hold as collateral security for said note, and apply the proceeds toward the liquidation of said loan." The letter was signed with the name of the maker, "Thomson & Kelly Co." It did not bear the signature of either indorser. There was no evidence that thereafter there was any communication, oral or written, between the indorsers or the maker and the bank (except that one of the indorsers made a payment of $2,500 to the bank in June, 1930) until March, 1932, when the liquidating agent of the bank, which had closed, wrote to the maker demanding payment of the loan.

When the third instalment payment had been made there was then no default on the note or under the terms of the collateral agreements which the indorsers signed. The bank did not demand further security or an additional payment on account on the ground that the security held was unsatisfactory. It had at that time under the existing agreements of pledge no right to sell the collateral nor was it by virtue of those agreements under obligation upon a request from the pledgors to make such sale. It is, however, the contention of the indorsers that the statements of the president of the bank on the occasion when the third instalment payment was made might be found to amount to a promise on the part of the bank to sell the collateral, which resulted in a binding agreement when the bank received the letter signed with the name of the maker of the note requesting the sale of the collateral. If it be assumed that a finding was warranted that the president of the bank was not merely inviting a request without agreeing in advance to comply with it, but was in fact making a promise, we do not think the evidence permits the conclusion that an agreement binding the indorsers and the bank resulted.

The authorization which was requested by Marcus was manifestly an authorization by the indorsers whose stock constituted the collateral. It was pledged "to secure . . . [their] endorsements." The maker of the note had no interest in the stock which the indorsers had pledged and could not make a new agreement binding on the indorsers which varied the terms of their existing agreements of pledge. The letter on which the indorsers here rely as the act which made binding the promise of Marcus for a unilateral contract did not bear nor purport to bear their signatures. It is true that one of the indorsers signed to the letter the name of the maker but there is nothing to show that Marcus knew that to be so. The evidence does not indicate that the indorser had authority to sign the maker's name or authority to bind the other indorser or that either indorser was an agent, employee or officer of Thomson & Kelly Co. The authorization received was not

the authorization sought by the plaintiff. The evidence does not warrant the finding that the only act which could amount to an acceptance of the promise of the bank, that is, the delivery of a written authorization to sell from the indorsers, was ever performed. An acceptance which varies substantially from the offer does not make a binding agreement. *Moss* v. *Old Colony Trust Co.* 246 Mass. 139, 148.

Furthermore, it does not appear that anything done by the bank resulted in damage to the indorsers. While the market value of the stock during a period of ten days after the telephone conversation between Marcus and Thomson on March 13 appears in the record, there is nothing to show any lesser market value at any later time. There was no evidence on which any damages to the indorsers could be computed. They sought by recoupment the opportunity to offset in whole or in part damages which might be recovered by the plaintiff. The burden of proving damages in recoupment was on the indorsers. *Sayles* v. *Quinn*, 196 Mass. 492, 495. In recoupment a defendant establishes a defence to the plaintiff's claim only to the extent to which he proves damage. *Pothier* v. *Doucette*, 276 Mass. 326, 334. *Roche* v. *Gryzmish*, 277 Mass. 575, 578. If he produces no evidence of damage he makes no case in recoupment for the consideration of a jury.

<div align="right">

*Exceptions overruled.*
*Decree affirmed with costs.*