## MASSACHUSETTS HOUSING FINANCE AGENCY vs. WHITNEY HOUSE ASSOCIATES & others.[1]

No. 93-P-1123.

Suffolk. May 13, 1994. - September 2, 1994.

Present: DREBEN, KASS, & FINE, JJ.

*Massachusetts Housing Finance Agency. Contract*, Offer and acceptance, Parties.

A party to a loan contract (borrower) was liable to the lender under an arbitrage loss provision in an extension of the loan commitment, where the borrower's expressed reservations about the arbitrage condition was nonetheless an acceptance of that term and not a rejection or a counter offer. [241-242]

A party to a three-party contract was not entitled to enforce a contract provision plainly inserted to protect the interests of another party. [242-243]

Extensions of more time to an expired loan commitment did not constitute amendments to the original loan agreement, but rather were new agreements. [243]

CIVIL ACTION commenced in the Superior Court Department on March 25, 1991.

The case was heard by *Gordon L. Doerfer*, J., on a motion for summary judgment.

*Paul W. Shaw* for the plaintiff.

*Thomas P. Callaghan, Jr.*, for the defendants.

KASS, J. We are to decide whether a condition placed by the Massachusetts Housing Finance Agency (MHFA) on the extension of a loan commitment, that the borrower reimburse the MHFA for arbitrage losses, was enforceable. The question was submitted on the MHFA's motion for summary judgment, which a judge of the Superior Court resolved —

---

[1]Salvy J. Sacro and Sacro Corporation, who are general partners of Whitney House Associates, a limited partnership.

we think mistakenly — against the MHFA. We are of opinion that the MHFA is entitled to judgment in its favor.[2]

These are the material facts, based on the summary judgment materials. MHFA first issued a commitment for a permanent loan (i.e., a "take out" loan to be disbursed only when construction had been substantially completed) of $2,194,243 to Whitney House Associates (Whitney) in 1981. Whitney is a limited partnership. To fund its commitment obligations to Whitney as well as to other entities, MHFA issued bonds on December 1, 1981, and earmarked $2,194,243 for the Whitney loan.[3] Whitney experienced a variety of difficulties (including a fire in 1982 in the historic building to be made over into fifty dwelling units) such that it neither lined up construction financing nor started construction. On February 23, 1984, MHFA issued a new commitment for the Whitney loan, containing a condition that construction be completed by November 1, 1985.

Delay continued to bedevil Whitney's project. It passed the November 1, 1985, deadline by a wide margin, but MHFA stayed with the undertaking and, on December 18, 1987, "recommitted" to it when Whitney obtained a construction loan commitment from the BayBank/Middlesex (BayBank). That renewed obligation on the part of MHFA was memorialized by a "tri-party agreement" among Whitney, BayBank, and MHFA, which established December 18, 1988, as the new deadline for completion of construction; i.e., the commitment expired on that date if the contemplated improvements were not substantially finished. Once again, Whitney could not make the deadline date and required an extension of the commitment.

---

[2]The claim for arbitrage losses was the first count of the complaint brought against Whitney by MHFA, and it is the claim in contention on appeal. The judge awarded MHFA $15,026.18 on a second count having to do with differential interest on an escrow account. This appeal does not concern itself with that aspect of the underlying action and, indeed, the parties appear to have agreed before the motion judge that MHFA was entitled to judgment on the second count.

[3]The bond issue, designated MHFA Residential Development Bond Issue II, 1981 Series A, aggregated $47,410,000.

By letter dated December 15, 1988, MHFA offered what was roughly a six-month extension (it ran to June 1, 1989). The extension was subject to three conditions, the third of which provided that the "[d]eveloper will be responsible for reimbursing the Agency for any arbitrage losses it incurs from and after January 1, 1989." By arbitrage losses, the MHFA meant the difference between the interest it was paying the bondholders on the $2,194,243 it had set aside for the Whitney project and the amount it could earn on that money on the then current short term market. Prior to the extension of December 15, 1988, MHFA had already sustained arbitrage losses of $488,430. The MHFA letter granting the extension, by its terms, was valid only if signed and returned by Whitney. Salvy J. Sacro, the managing general partner of Whitney, signed his name on the line marked "Accepted by" and added to the right of his signature the typewritten message: "See Attached Letter Dated 12/30/88." In that letter Sacro wrote that his acceptance of the extension had been "signed by me under protest and reserving all my legal rights with respect thereto." He added: "I ask also that since I am being assessed with the arbitrage deficit, that the Agency immediately provide me with a detailed description of how the daily charges are calculated, the plan of investment for the Whitney School bond proceeds, and any other data that would enable me to calculate the arbitrage deficit."

There were four more extensions, for varying periods, the last extending the MHFA commitment to June 12, 1990. On each of these, Sacro placed his signature on the line marked "Accepted by" and added in handwriting or typewriting, "But Accepted With Prejudice." Ultimately, Whitney obtained permanent financing from Everett Savings Bank and MHFA, on April 1, 1991, redeemed the bonds through which it had obtained the funds held for the Whitney project. MHFA demanded reimbursement from Whitney for its arbitrage losses, which came to $188,293. That amount is not in contention; Whitney's position is that it owes nothing at all because: first, it did not accept the arbitrage loss condition in the extension; and, second, the introduction of that

condition violated § 4 of the tri-party agreement, which provided: "The Borrower and MHFA agree that the Commitment shall not be amended or modified in any respect whatsoever without the express prior written consent of the Bank."

1. *The effect of Sacro's hedged acceptance of the commitment extension.* Whitney argues that the "see attached letter" and "but accepted with prejudice" notations over and beside Sacro's signatures denoting Whitney's acceptance of the extension conditions sufficiently varied the terms of MHFA's offer so that Whitney's "acceptance" was not a binding one. A substantial variation in contract terms incident to a purported acceptance is not a binding acceptance but a counter offer. *Bank of United States* v. *Thomson & Kelly Co.*, 290 Mass. 224, 228 (1935). *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 240 (1979). A comment, purported clarification, or expression of dissatisfaction appended to an endorsement of acceptance, however, does not have the same effect. Those are in the category of "grumbling acceptances," acceptances made without enthusiasm but acceptances nonetheless. See *Nelson* v. *Hamlin*, 258 Mass. 331, 340 (1927); *Costello* v. *Pet Inc.*, 17 Mass. App. Ct. 382, 386-387 (1984); *Brangier* v. *Rosenthal*, 337 F.2d 952, 954 (9th Cir. 1964); *Panhandle Eastern Pipeline Co.* v. *Smith*, 637 P.2d 1020, 1023 (Wyo. 1981); 1 Corbin, Contracts § 3.30 (Perillo rev. ed. 1993). The idea is expressed with more formality in the Restatement (Second) of Contracts § 61 (1979): "An acceptance which requests a change or addition to the terms of the offer is not thereby invalidated unless the acceptance is made to depend on an assent to the changed or added terms."[4]

What Sacro wrote on behalf of Whitney was not a counter offer. The first of Whitney's reservations was expressed in a side letter which merely expressed distress about the imposition of the arbitrage condition, not rejection of it, and requested numbers so that Whitney might better know what

---

[4]The Uniform Commercial Code, while not applicable here, contains an analogous provision. See G. L. c. 106, § 2-207(1).

the cost would be. The "accepted with prejudice," communicated no more, i.e., that Whitney did not like the arbitrage condition, expected to talk more about it, but, grudgingly accepted it in preference to having the MHFA commitment expire. For its part, Whitney accepted the benefit of the extension documents, namely, the extension of the permanent loan commitment, without which the project would have been in dire jeopardy. Whitney needed an extension of its permanent loan commitment and Sacro, on behalf of Whitney, accepted the terms of that extension with his fingers crossed behind his back. It lies ill in Whitney's mouth, after obtaining what it needed, to disavow the arbitrage condition.

2. *Bearing of the tri-party agreement.* The alternative ground for invalidating the arbitrage condition, upon which the motion judge particularly relied, is that it was an impermissible alteration of the revived 1984 commitment letter appended to the tri-party agreement. The purpose of the tri-party agreement was to provide legally enforceable assurance that BayBank's loan during the construction phase of the project could be repaid from proceeds of the permanent loan after construction had been completed. BayBank, before advancing construction loan funds, would wish to assure that there be no changes in the permanent loan commitment which might be adverse to its interests, e.g., a change in design specifications or alteration in time for completion of construction. For that reason, the architecture of § 4 of the tri-party agreement is that· "the Borrower and MHFA agree" the commitment was not to be amended without "the prior written consent of the Bank." The undertaking is a pledge by Whitney and MHFA to BayBank. The absence of BayBank from this case speaks loudly about its indifference to the arbitrage losses controversy, leaving it to Whitney to invoke the "no amendments" provision of § 4. A party may not, however, enforce a contract provision plainly inserted for the benefit of another. Cf. *Shapiro* v. *Grinspoon*, 27 Mass. App. Ct. 596, 600-601 (1989); *In re Fordham*, 130 B.R. 632, 642 (Bankr. D. Mass. 1991). BayBank was the intended beneficiary of § 4 and, analytically, the positions of Whitney and

MHFA in the context of § 4 resemble those of incidental third-party beneficiaries who may not enforce contract provisions. See *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 542-548 (1979); *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195-196 (1982); *Plymouth Hous. Authy.* v. *Plymouth*, 401 Mass. 503, 505 (1988); Restatement (Second) of Contracts § 302(2) (1979).

Nor do we think the five extensions, except in the most mechanical way, i.e., they repeatedly established a new expiration date for the commitment and, in that sense, amended it, are correctly viewed as amendments to the permanent loan commitment. By the time the first extension was signed and returned by Sacro, the original loan commitment had expired, a fact of which BayBank would be aware. By breathing life into an otherwise dead contract, the extensions acquire the character of new agreements, the terms of which are conveniently filled by the original one. Cf. Farnsworth, Contracts § 4.24 (2d ed. 1990); 5 Williston, Contracts § 680 at 263 (Jaeger 3d ed. 1961). They do not implicate § 4 of the tri-party agreement.

For the reasons stated, the arbitrage loss condition of the various extensions is enforceable by MHFA against Whitney. The judgment is reversed, and judgment shall enter for MHFA in the amount of $188,293.

*So ordered.*