Curran, Dennis J., J.
Introduction
John J. Dennis sued Flick Kaskel for damages arising out of an alleged breach of contract.
Dennis claims he advanced monies to Kaskel which he, in turn, used to purchase a market partnership in his employer’s company, Texas Roadhouse, LLC. According to Dennis, he invested $50,000 with Kaskel (who was then in difficult financial straits) in exchange for receiving 22.5% of Kaskel’s future annual bonuses and stock options as long as Kaskel was employed by Texas Roadhouse, LLC. Dennis alleges that he bore the trio of risks of either Kaskel’s termination, his quitting Texas Roadhouse, or his failure to secure a bonus from his employer. Dennis asserts that he never expected the return of the $50,000 from Kaskel. Kaskel counters that the $50,000 was a straightforward loan, but concedes that the repayment terms were neither agreed to nor put in writing.
Procedural History
On April 30, 2009, a prior session judge allowed Dennis’s motion for summary judgment as to liability, conducted a hearing on damages, and issued a ten-page memorandum of decision which resulted in a judgment for Dennis. Kaskel appealed, the Appeals Court agreed and reversed the judgment, detailing the following as unresolved factual issues:
(1) whether Dennis and Kaskel ever agreed to the terms of the memorandum which Dennis forwarded with his initial $25,000 advance;
(2) whether the memorandum was a binding contract, i.e., an expression of the parties’ agreement as to all material terms, or simply an agreement to guide further negotiations;
(3) whether Dennis’s 22.5 percent of Kaskel’s bonus payments were to be calculated before or after taxes; and
(4) how the 22.5 percent of Kaskel’s stock options would be determined.
The parties waived their right to a jury trial. Trial proceeded on January 4, 2012. Based on the credible evidence and reasonable inferences from that evidence, the following are Findings of Fact, beginning with those facts which were either stipulated or are undisputed, followed by findings as to disputed facts.
FINDINGS OF FACT
A. Stipulated Facts
In early 2001, Kaskel was offered an opportunity to become a “market partner” with Texas Roadhouse Holdings, LLC a national restaurant chain. His compensation package consisted of a salary, bonuses, and stock options. His annual salary was $55,000, later increased to $75,000, and the bonuses amounted to *561 eight percent of the “pre-tax income” of each restaurant for which Kaskel was responsible.
Before Kaskel could become a market partner, Texas Roadhouse required him to invest $50,000 in Texas Roadhouse in two equal installments of $25,000: the first payment was due when he signed his employment agreement and the second payment when a second restaurant opened for which he was responsible. This agreement also provided that Texas Roadhouse would hold the money and make it available to Kaskel so that he could buy the first $50,000 worth of Texas Roadhouse stock options he elected to buy under the company’s stock option plan.[1]
Kaskel did not have $50,000 to buy a market share of Texas Roadhouse, LLC. Instead, he approached Dennis, a business acquaintance, for a loan. After Kaskel’s request, on or about Februaiy 1, 2001, Dennis wired Kaskel $25,000, together with a memorandum that stated in part:
. . . John Dennis shall wire funds in the amount of $25,000.00 from his personal bank account to the . . . account [of Rick Kaskel] for the sole purpose of entering into an agreement with Rick Kaskel whereby John Dennis shall enjoy a percentage of the benefits that shall accrue to Rick Kaskel as a result of his position as a market partner with Texas Roadhouse — those benefits are more fully described below.
***
The benefits that shall accrue to John Dennis as a result of this investment of $25,000 and the subsequent investment of an additional $25,000, as may be required by Texas Roadhouse, shall be as follows:
A continuing interest equal to 22.5% of the annual operating bonus payable to Rick Kaskel for each store in which Rick Kaskel is involved.
22.5% of any stock options which Rick Kaskel is granted by Texas Roadhouse.
***
It is the stated intent to enter into a legally binding agreement that shall be constructed by an attorney(s) on behalf of John Dennis and Rick Kaskel which incorporates the above business terms not later than Februaiy 23, 2001. If such an agreement has not been signed by that time, John Dennis shall have the option to extend the time for such an agreement or demand repayment of the $25,000 investment which Rick Kaskel agrees to reimburse within (7) days of notification.
On Februaiy 2, 2002, about a year later, Dennis wired Kaskel the second installment of $25,000. Kaskel turned over both installments to Texas Roadhouse.
In March 2002, Dennis tendered Kaskel a proposed agreement, ostensibly designed as the “legally binding agreement” contemplated by the memorandum. The single-spaced, 14-page proposal would have created an entity called Boston Roadhouse, LLC. After a year of discussing different drafts of this agreement, which the parties confirm was neither signed nor agreed to, Dennis sent an e-mail to Kaskel in Februaiy 2003, requesting that they meet to finalize this proposal. Kaskel responded that the agreement was “way too complicated,” and promised to telephone Dennis promptly to set up a meeting to discuss the financial loan.
Kaskel emailed Dennis that he sought an arrangement “equitable for both of us, since you’ve taken the risk with the money and I’ve made the commitment of spending my life the last two years and for the foreseeable future in these restaurants each and eveiy day 24/7 insuring their success.” Kaskel’s e-mail also described his anticipated cash flow over the next few months. He proposed that they discuss some sort of graduated repayment schedule that increased to a cap as new restaurants came on board, the potential or poor payback and high risk of using stock grants in the agreement due to option strike prices and poor stock market conditions, and factoring “in [n]et [b]onus payouts (not gross) and the highly taxable rate of [b]onus [p]ayouts.” Dennis’s and Kaskel’s exchanges failed to produce an agreement.
Dennis brought suit to enforce the terms of the initial memorandum.
B. AGREED FACTS
1. Dennis and Kaskel knew one another as business acquaintances beginning about 2000.
2. As of Februaiy 2001, Kaskel had been unemployed for about one and one-half years.
3. Kaskel had had extensive experience in the restaurant and hospitality business.
4. Toward the end of the year 2000, the national chain restaurant Texas Roadhouse offered employment to Kaskel, who was then unemployed.
5. Kaskel accepted employment with Texas Roadhouse and signed an employment agreement dated Februaiy 5, 2001. (Exhibit 1.)
6. Under that employment agreement, Kaskel was entitled to receive a base salaiy of $55,000 per year, and bonuses and stock options granted at the sole discretion of Texas Roadhouse’s board of directors.
7. Concurrently with the execution of this employment agreement, Kaskel was required to make a cash deposit of $25,000 with the company. In conjunction with the opening of the second restaurant, an additional $25,000 deposit will be made by Kaskel to the company. These deposits were required for Kaskel’s participation in the stock option plan. (See Exhibit 1, page 3.)
8. Sometime in January of 2001, Kaskel asked Dennis for a loan of $50,000; Dennis responded that he would “think about it.”
*562 9. Shortly thereafter, Dennis responded with a proposal, the terms of which were outlined in a memorandum dated February 1, 2001. (Exhibit 2.)
10. Dennis faxed the proposal (i-e., memorandum— exhibit 2) to Kaskel on or around February 1, 2001.
11. Dennis telephoned Kaskel either shortly before, or contemporaneously with, Dennis’ faxing of the proposal to Kaskel.
12. At deposition, Kaskel recalled none of the specifics of the telephone conversation.
13. During the conversation, Kaskel asked Dennis to send the first installment of $25,000 to Kaskel’s personal bank account by wire transfer.
14. Dennis sent the first installment of $25,000 to Kaskel’s personal bank account.
15. Kaskel used the $25,000 Dennis sent him as the first installment to pay his “market share” obligation so that he could qualify for Texas Roadhouse’s stock option plan under Exhibit 1, page 3.
16. Some months later, Kaskel asked Dennis to send the agreed-upon second $25,000 installment; Dennis did so.
17. Kaskel also used the second installment of $25,000 to enter Texas Roadhouse’s stock option plan. (Exhibit 1, page 3.)
18. In March 2002, Dennis tendered Kaskel a proposed single-spaced, 14-page agreement which would have created an entity called Boston Roadhouse, LLC.
19. With three pages of definitions, the proposal provided that Kaskel would own 77.5 percent of Boston Roadhouse, and Dennis would own the balance.
20. According to the proposal, after the creation of Boston Roadhouse, Kaskel would deliver to Boston Roadhouse all the stocks, dividends, and bonuses he received from Texas Roadhouse.
It also called for voting and non-voting members of Boston Roadhouse, the former of which could be individuals, corporations, partnerships, or limited liability companies, and all memberships would be transferable.
It would have prohibited Kaskel from engaging in any future business transaction with Texas Roadhouse, except through Boston Roadhouse.
21. Following about a year of discussing different drafts of the proposed Boston Roadhouse agreement, none of which was ever signed or otherwise agreed to, Dennis sent an email to Kaskel in February 2003, and asked for a meeting to finalize the original “Boston Roadhouse” draft, a copy of which he attached.
22. Kaskel responded that the agreement “was way too complicated,” and promised to “set up a meeting to discuss [the] financial loan."
23. Both Kaskel and Dennis agreed that the “Boston Roadhouse” document drafted by attorney Pomeroy was too complicated.
24. To this date, Kaskel has failed to pay Dennis any money.
25. Kaskel’s Texas Roadhouse compensation for the year ended December 31, 2001 was $70,872.82, of which $15,872.82 constituted his bonus for that year over his $55,000.00 base salary. (See Exhibit 3.)
26. Kaskel’s Texas Roadhouse compensation for the year ended December 31, 2002 was $151,696.52, of which $96,696.52 constituted his bonus for that year over his $55,000.00 base salary. (See Exhibit 4.)
27. Kaskel’s Texas Roadhouse compensation for the year ended December 31, 2003 was $248,968.57, of which $ 193,968.57 constituted his bonus for that year over his $55,000.00 base Salary. (See Exhibit 5.)
28. Kaskel’s Texas Roadhouse compensation for the year ended December 31, 2004 was $479,842.11, of which $424,842.11 constituted his bonus for that year over his $55,000.00 base Salary. (See Exhibit 6.)
29. Kaskel’s Texas Roadhouse compensation for the year ended December 31, 2005 was $602,619.47, of which $547,619.47 constituted his bonus for that year over his $55,000.00 base Salary. (See Exhibit 7.)
30. In 2006, Kaskel’s base salary increased from $55,000.00 per year to $75,000.00 per year.
31. Kaskel’s compensation from Texas Roadhouse for the year ended December 31, 2006 was $1,024,811.75, of which $949,810.75 constituted his bonus for that year over his $75,000.00 base salary. (See Exhibit 8.)
32. Kaskel has been granted 133,946 options to Texas Roadhouse common stock from April 3, 2002 thru November 3, 2006, per the schedule dated May 17, 2009 found at Exhibit 13.
36. When Kaskel asked Dennis for a loan of $50,000.00, he did not have $50,000.00 in assets available to make the investment with Texas Roadhouse. He also knew that his pending position with Texas Roadhouse was contingent on him investing the $50,000.00.
37. Kaskel was unable to refinance his home at the time of the Texas Roadhouse offer because his mortgage exceeded the fair market value of his home, and also because he was unemployed.
38. Kaskel never identified any alternative source of funds from which he could have obtained the $50,000.00 he needed to give to Texas Roadhouse.
39. Kaskel never attempted to find the $50,000.00 from sources other than Dennis.
40. Before Texas Roadhouse, Kaskel’s last employment had been as vice president with Rare Hospitality, a major restaurant chain in the United States.
41. Dennis believed his experience in finding sites for other restaurant chains would help Kaskel succeed in achieving greater bonuses from Texas Roadhouse.
*563 42. Based upon these facts, Dennis was willing to consider advancing $50,000.00 to Kaskel.
43. After rejecting loaning $50,000.00 to Kaskel, Dennis proposed advancing $50,000.00 in exchange for a 50% continuing interest in any bonuses and any stock options Kaskel received from Texas Roadhouse.
44. By late January or early February 2001, Kaskel was traveling and working in Kentucky, undergoing training with Texas Roadhouse.
45. At some point in early February 2001, Kaskel telephoned Dennis and asked him for the first installment of $25,000.00.
46. Dennis testified at trial that he misplaced the signed memorandum. He believes it was misplaced when he moved in 2003.
47. Dennis sent the first installment of $25,000 to Kaskel’s personal bank account.
48. Kaskel used this $25,000.00 to invest in Texas Roadhouse.
49. About six months after Kaskel received the first $25,000.00 installment, he again called Dennis and requested the second installment of $25,000.00.
50. Both Dennis and Kaskel agree that Kaskel called to request the second $25,000.00 installment. Kaskel does not recall any of the details of this second telephone conversation.
51. Dennis sent Kaskel the second $25,000.00.
52. After receiving both installments, Kaskel never proposed any terms commonly found in loan agreements such as an interest rate, a repayment schedule or a term of payments.
53. Kaskel never repaid Dennis any of the $50,000.00 advanced by him.
54. At no time before the start of this litigation did Kaskel provide Dennis with any bonus or stock option grant information.
55. However, in Exhibit 10, Kaskel did refer to how many times stock options were granted to him, in which he stated: “5. First and only 2 disbursements of Stock options were granted at a strike price of $22 a share and $27 a share respectively.”
56. The only documented reference Kaskel produced in which he (not Dennis) referred to the word “loan” may be found at Exhibit 13. This was an email, dated February 3, 2003, sent almost two years to the day after Dennis sent the memorandum. (Exhibit 2.) It came at a time when: 1) bonus payments from four (4) restaurants were starting to be paid to Kaskel; and 2) additional restaurants were beginning to open in Kaskel’s area. (Exhibit 13.)
57. That email was also sent about one month after Kaskel received his fourth stock option grant, dated January 1, 2003. That grant provided Kaskel with 2,758 options for Texas Roadhouse common stock. (Exhibits 9 and 13.)
58. Kaskel testified at trial that he was entitled to be paid any bonus due him within thirty days of it being calculated, under his employment agreement. (Exhibit 1, page 2, and Exhibit 10.)
59. Kaskel provided, and Dennis received, a copy of Kaskel’s employment agreement with Texas Roadhouse before the parties entered their agreement. (Exhibit 2.)
60. When Kaskel sent Exhibit 10 to Dennis in about May 2003, four Texas Roadhouse restaurants, in Methuen, Dartmouth, Brockton and Everett, were either producing bonus income to Kaskel or would soon be doing so.
61. Kaskel’s employment agreement with Texas Roadhouse provided that any bonus received by him depended upon the performance of the restaurants under him. Further, any stock options granted him were at the discretion of Texas Roadhouse. (Exhibit 1, pages 2 and 3.)
62.Kaskel received the following compensation for 2001 through 2006:
Compensation over Year Gross Wa ges $55.000 22.5% of Compensation over $55.000
2001 $70,872.82 $15,872.82 $3,571.38
2002 151,696.52 96,696.52 21,756.72
2003 248,968.57 193,968.57 43,642.93
2004 479,842.11 424,842.11 95,589.47
2005 602,619.47 547,619.47 123,214.38
2006 1.024.810.75 942,9.10.75 213.707.42
Totals $2,578,810.24 $2,228,810.24 $501,482.30
63. For the years 2001 through 2006, Kaskel was granted 133,946 options to purchase Texas Roadhouse common stock.
64. Twenty-two and one-half percent (22.5%) of Kaskel’s bonuses equals $501,482.30 for the years 2001 through 2006.
65. Twenty-two and one-half percent (22.5%) of stock options granted to Kaskel by Texas Roadhouse equals 30,137.85 stock option grants.
66. Dennis testified at trial that the memorandum found at Exhibit 2 constituted the entire agreement between the parties.
67. The memorandum states, in part, that “It is the stated intent to enter into a legally binding agreement that shall be constructed by an attorney(s) on behalf of John Dennis and Rick Kaskel which incorporates the above business terms not later than February 23, 2001.” (Exhibit 2.)
68. Dennis never requested that Kaskel return the $25,000.00 referred to in Exhibit 2.
69. The plaintiffs amended complaint refers to the “legally binding agreement” referred to in Exhibit 2 as a modification to the memorandum agreement.
70. No signed copy of the memorandum has been produced in this litigation, to Martin Pomeroy or the attorneys representing the parties in this action.
*564 71. Rick Kaskel testified at trial that he never signed the memorandum found at Exhibit 2.
72. John Dennis drafted the memorandum found at Exhibit 2.
73. Kaskel agreed to the terms in the memorandum; moreover, his actions in accepting the first installment when he knew Dennis never considered this arrangement as a loan, and his request that Dennis send the second installment, knowing the terms of the memorandum, establishes that Kaskel agreed to the terms of the loan.
C. FINDINGS AS TO THE PLAINTIFF’S REQUESTS
ALLOWED as to requests numbered 1 through 37, since they have been stipulated between the parties.
ALLOWED as to requests numbered 38 through 42, 46, 48 through 50, 54, 59, 65, 66, 69 through 71, 79,[2] 81,[3] 85, 86, 92, 94 through 97, 102, 108, 109, 112 and 113.
FURTHER, ALLOWED as to requests numbered 43, 44, 45, 47, 51, 52, 53, 55, 57, 58, 61 through 64, 67, 68, 72 through 78, 82 through 84, 87 through 91, 93, 98 through 101, 103 through 107, 110 and 111.
DENIED as to requests numbered 56, 60 and 80.
D. FINDINGS AS TO THE DEFENDANTS REQUESTS
ALLOWED as to requests numbered 1 through 37, since they have been stipulated between the parties.
ALLOWED as to requests numbered 38, 39, 41, 42, 49, 50, 51 and 52.
DENIED as to requests numbered 40, 43 through 48, and 53.
DISCUSSION
This case turns on credibility: the plaintiff John Dennis has it; the defendant Kaskel does not.
There is little doubt that Dennis — neither a relation nor friend of Kaskel’s — would have ever loaned $50,000 to a mere “business acquaintance.” This was not a loan. Dennis was a businessman. Instead, I find that a written agreement (the memorandum — trial exhibit 2) was executed contemporaneously with the wiring of the first $25,000 to Kaskel’s bank account. That Dennis cannot presently find the agreement because he misplaced or lost it over the intervening decade is, of course, troublesome, but not dispositive. At trial, his testimony carried the day: it was convincing and steadfast; Kaskel’s testimony was self-serving, equivocal and not believable. A disturbing undercurrent in Kaskel’s trial testimony is that his hard work over the years somehow cancelled the obligation he had made to Dennis when he so desperately needed the cash to pay Texas Roadhouse so that he could become a “market partner.”
To reach this conclusion, the following nine facts (in addition to those Findings of Fact outlined above) are determinative:
1.) The first payment of $25,000 in cash is a very significant sum of money.
2.) The second payment of $25,000, also in cash, for a total of $50,000, is even more substantial and probative.
3.) When Dennis advanced the first significant amount of money, Kaskel was a mere business acquaintance, Kaskel had been unemployed for a significant period and indeed, had no equiiy in his own house from which to raise the needed $25,000 to pay Texas Roadhouse, LLC.
6.) Before accepting Dennis’s cash, Kaskel sought no other source for the money.
7.) At deposition, Kaskel testified that he had no memory of what he had said as to the terms of such a large payment just before Dennis agreed to advance him the $25,000.
8.) However, critically, under cross-examination at trial, Kaskel essentially admitted that he had said whatever he needed to convince Dennis at the time to advance him the $25,000.
9.) At trial, Kaskel appeared to rationalize his present belief that Dennis had “loaned” him the money because of the hard work he had expended for Texas Roadhouse. However. Kaskel seemed to have forgotten that his opportunity to make significant monies would never have occurred but for Dennis’s willingness to stake his position with Texas Roadhouse when he simply could never have come up with the money on his own.
A meeting of the minds is essential to the creation of a contract. Nortek, Inc. v. Liberty Mutual Insurance Company, 65 Mass.App.Ct. 764, 772 (2006). The manifestation of mutual assent normally takes the form of an offer from one party that is accepted by the other. See I&R Mech., Inc. v. Hazelton Mfg. Co., 61 Mass.App.Ct. 454, 455 (2004). “An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.” Restatement (Second) Contracts, Section 24 (1981). “(W]hen an offeree accepts the offeror’s services without expressing any objection to the offer’s essential terms, the offeree has manifested assent to those terms.” Polaroid Corporation v. Rollins Env’t. Serv. (NJ), 416 Mass. 684, 691 (1993). “A comment, purported clarification, or expression of dissatisfaction appended to ... an acceptance” does not constitute a counteroffer but instead a “grumbling acceptance” of the offered terms. Massachusetts Housing Finance Agency v. Whitney House Associates, 37 Mass.App.Ct. 238, 241 (1994). Where the parties have agreed to all material terms during preliminary negotiations, the fact that they also agreed to execute a subsequent *565 formal instrument does not preclude the finding of a binding contract. McCarthy v. Tobin, 429 Mass. 84, 88 (1999).
Kaskel approached Dennis. He asked to borrow the $50,000 he needed to put up his share to qualify as a market partner with Texas Roadhouse, LLC. Dennis initially demurred, promising only to consider the offer. Dennis then drafted a memorandum and presented it to Kaskel. The memorandum constituted Dennis’ rejection of Kaskel’s offer of a loan agreement, and his counter-offer to invest the $50,000 in Kaskel’s Texas Roadhouse business opportunity. The memorandum sets forth Dennis’s offer to wire Kaskel two payments of $25,000 in exchange for 22.5% of all future bonus and stock options Kaskel might receive as a market partner. Kaskel accepted Dennis’s offer by receiving its benefits, i.e., the $50,000. Polaroid Corporation v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 691 (1993). Kaskel cannot, and does not, dispute that he accepted the $50,000 from Dennis, or that he used the funds to obtain a position as a market partner with Texas Roadhouse, all as detailed in the memorandum. Although Kaskel may have expressed reservations about the terms of the memorandum, by accepting the $50,000, he signaled his “grumbling acceptance” of Dennis’s offer memorialized in the memorandum. Massachusetts Housing Finance Agency v. Whitney House Associates, 37 Mass.App.Ct. 238, 241 (1994). Similarly, the mere fact that the memorandum stipulated that the parties would execute a subsequent agreement does not render it unenforceable. McCarthy v. Tobin, 429 Mass. 84, 88 n.3 (1999). In fact, the language of the memorandum makes clear that the proposed agreement would merely effectuate the purpose of the memorandum by incorporating its “business terms,” and that it would not allow for open-ended negotiations.
Kaskel admitted at his deposition that “[Dennis] never, even agreed that he would ever think of it [the $50,000] as a loan.” Further, the emails between the parties show that Dennis provided the $50,000 subject to the terms of the memorandum and not as a loan. Between early 2003 and May 16, 2005, the parties exchanged numerous emails regarding their agreement. Only once did Kaskel refer to the agreement between the parties as a “financial loan,” and then only within the context of simplifying and finalizing the proposed agreement, which itself reaffirmed the terms of the memorandum. Other emails between the parties unambiguously demonstrated the parties’ efforts to create the proposed agreement along the lines stipulated in the memorandum. Critically, the email Kaskel sent to Dennis in early 2003 shows that Kaskel had developed “contract remorse,” and that he wanted to renegotiate the terms of the memorandum. In that email, Kaskel wrote that 90% of his expected future income would come from bonuses and stock options, and expressed his desire that the parties reach an “equitable” agreement. He also conceded that Dennis had “taken the risk with the money,” indicating the parties’ shared business interest. Most importantly, the four “discussion points” Kaskel identified in his email focused on issues associated with the calculation of payments based on bonus and stock options as found in the memorandum, not on principal and interest payments which would have been more characteristic of a loan agreement.
Finally, we address the significant issues of detail that concerned the Appeals Court: 1.) whether Dennis’s 22.5% of Kaskel’s bonus payments would be taxable to Kaskel before or after taxes, and 2.) whether 22.5% of Kaskel’s stock option were to be paid from pre-tax or post-tax dollars. See Dennis v. Kaskel, 79 Mass.App.Ct. 743 (2011).
Dennis testified that his negotiations with Kaskel began with his proposal that Kaskel give him a 50% interest in both Kaskel’s bonus and grants of stock options in exchange for the $50,000. He further testified that both he and Kaskel eventually settled on 22.5% of Kaskel’s bonus and stock option grants. The memorandum reflects that 22.5% interest in bonus and stock option grants. Dennis testified at trial that under the terms of the memorandum: 1.) if, for example, Kaskel got a $100,000 bonus, he (Dennis) would receive $22,500; and 2.) if Kaskel was granted 1,000 options, Dennis would be entitled to 225 options. He knew when he was negotiating that whatever bonus or grants were due him, he would pay taxes on them, but in any event, that he and Kaskel negotiated for a percentage of Kaskel’s (gross) bonus and not a net bonus, and for grants and not the exercised amount of the net or tax amount of options exercised.
The language of the memorandum supports Dennis’s testimony:
A continuing interest equal to 22.5% of the annual operating bonus payable to Rick Kaskel for each store in which Kaskel was involved; and
22.5% of any stock options which Kaskel is granted by Texas Roadhouse.
Kaskel’s bonus was a defined term. Under his employment agreement,[4] his bonus was calculated as follows: “. . . the [mjarket [p]artner shall also be entitled to receive a bonus (the “Bonus”) equal to eight percent (8%) of the Pre-Tax Income of the restaurants . . .” Kaskel had provided Dennis with a copy of that employment agreement. Dennis testified that he knew Kaskel’s low base salary meant that he would more likely be heavily compensated with bonuses. Moreover, the language used in the memorandum indicates that both men knew exactly what Dennis sought in exchange for his advance of $50,000. The memorandum states:
. . . Dennis shall enjoy a percentage of the benefits that shall accrue to Rick Kaskel as a result of his position as a market partner with Texas Road *566 house — those benefits are more fully described below. . .
The controlling issue is not whether the memorandum should have been more detailed, but rather, what the intention of the parties was. Dennis wanted 22.5% of the bonus “that shall accrue to Kaskel.” Kaskel agreed that every year his bonus would be a certain amount. Under the parties’ agreement, Dennis was entitled to 22.5% of those bonuses.
When the memorandum was negotiated, both men understood that when the memorandum referred to “bonus,” it meant a gross or pre-tax bonus, and not a net bonus. Sometime after Januaiy 1, 2003 and before May 5, 2003, Kaskel sent Dennis an email (exhibit 10) in which he wrote: “Discuss payment schedule to factor in ’’Net Bonus payouts (Not Gross) and the highly taxable rate of Bonus Payouts." (See exhibit 1, page 1.) Kaskel acknowledges that gross bonus payouts were taxable at a high rate. He is not claiming that gross bonus payouts were not contemplated in the memorandum. This distinction is important. While basing the 22.5% on post-tax bonuses would be more advantageous to Kaskel, it was not what the parties agreed to. Kaskel’s attempt to change the deal by sending Dennis an email two years after they had entered the agreement smacks of revisionist history. It does not render it unenforceable for “lack of detail.”
There was sufficient detail on the bonus term to establish an enforceable contract.
These arguments raised as to the bonus payments apply with equal force to the issue of stock options. Indeed, the memorandum language is even more direct. Dennis, in exchange for the $50,000, was entitled to:
22.5% of any stock options which Rick Kaskel is granted by Texas Roadhouse.
Dennis testified credibly at trial that if Kaskel received 1,000 grants, he was entitled to 225, just as provided in the language of the memorandum. (See also exhibit 10, in which Kaskel wrote on page 1 at number 3 at the bottom of the page: “Need to understand the potential of poor payback and high risk of using Stock Grants in the agreement due to Option Strike Prices and poor Stock market conditions.”) Thus, Kaskel was not confused over whether “the 22.5% of [his] stock prices would be determined on the number of options, the strike price, or the price at which Kaskel sold the shares.”
There was sufficient detail produced at trial on the issue of stock option grants to form an enforceable contract.
Finally, the Appeals Court was concerned as to when bonuses and stock options grants were to be paid. The memorandum and its surrounding circumstances suggest that the parties contemplated a time for payment. The memorandum states
It is understood and agreed that John Dennis shall wire funds in the amount of $50,000 from his personal account to the following account as has been requested by Rick Kaskel ... for the sole purpose of entering into an agreement with Rick Kaskel whereby John Dennis shall enjoy a percentage of the benefits that shall accrue to Rick Kaskel as a result of his position as a market partner with Texas Roadhouse — those benefits are more fully described below . . .
The benefits that shall accrue to John Dennis as a result of this investment of $25,000 and the subsequent investment of an additional $25,000, as may be required by Texas Roadhouse shall be as follows . . . (Emphasis added.)
In the preceding excerpt, the parties twice used the word “accrue.” The context is also clear. “The benefits that shall accrue to John Dennis” are linked to a “percentage of the benefits that shall accrue to Rick Kaskel.” Indeed, their meaning is even clearer when cast against Kaskel’s employment agreement, which provided that the Texas Roadhouse was obligated to pay him any bonus due him “within 30 days of the release of the Profit and Loss Statement.” (See page 3 of exhibit 1.) “Accrue” means “(t]o come into existence as an enforceable claim or right.” Black’s Law Dictionary 23 (9th ed. 2009). Kaskel was required to pay Dennis when Texas Roadhouse was required to pay him.
In sum, there was a meeting of the minds; there was a written agreement; and the memorandum captured the essential terms.
Having made the deal, Kaskel is bound by its terms. Although the results may appear to be a windfall to Dennis, Kaskel would never have been in the position to make the money he did without Dennis’s critical assistance at a time he desperately needed it. There was no other source for this money: Kaskel was in a financial pinch; he knew the terms of the proposed agreement; he willingly entered into that contract; he ought to now be bound by his word.
ORDER
For these reasons, the Clerk shall enter the accompanying Judgment.

The employment agreement provided that the timing and amount of options available to Kaskel were committed to the sole discretion of the Texas Roadhouse’s directors. Unused portions of Kaskel’s deposit were to be returned to him when his employment ended.

The defendant’s response states “Admitted,” which the Court construes as “Undisputed.”

The defendant’s response states “Admitted,” which the Court construes as “Undisputed.”

See its Section 4(b).